IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PEGGY SNYDER,

Plaintiff,

v.

E.I. DUPONT de NEMOURS, INC.
AND COMPANY,

Defendant.

Civil Action No. 18-1266-CFC

---

Gary W. Aber, ABER, BAKER & OVER, Wilmington, Delaware

*Counsel for Plaintiff*

Margaret M. DiBianca, CLARK HILL PLC, Wilmington, Delaware; John M.
Nolan, John M. Nolan, III, JACKSON LEWIS PC, Philadelphia, Pennsylvania

*Counsel for Defendant*

## **MEMORANDUM OPINION**

February 5, 2021
Wilmington, Delaware

COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

Plaintiff Peggy Snyder alleges that Defendant E.I. DuPont de Nemours, Inc. terminated her employment in retaliation for her use of benefits under the Family Medical Leave Act (FMLA) in violation of 29 U.S.C. § 2615(2). D.I. 15 ¶ 80. Before me is DuPont's motion for summary judgment. D.I. 123.

## I.    BACKGROUND

Snyder was hired as a technician with DuPont at the Tralee Park worksite on September 1, 1997. D.I. 125 ¶ 1–2, D.I. 153 ¶ 1–2. Her position was "mostly" sedentary. D.I. 126 at A54. DuPont has a short-term disability plan for employees who are "unable to work because of an illness or injury." D.I. 125 ¶ 44; D.I. 153 ¶ 44. From 1997 through September 2016, Snyder took approximately 20 FMLA and short-term disability leaves of absence. D.I. 125 ¶ 121, D.I. 153 ¶ 121. Upon returning to work after each of these leaves, Snyder was placed in the same or a similar position with the same salary and benefits. D.I. 125 ¶ 122–123, D.I. 153 ¶ 122–123. DuPont granted every request Snyder made for a leave of absence. D.I. 125 ¶ 121; D.I. 153 ¶ 121.

On March 16, 2016, Snyder underwent posterior tibial tendon reconstruction surgery on her left foot. D.I. 125 ¶ 46–47; D.I. 153 ¶ 46–47. Dr. Paul Kupcha performed the surgery. D.I. 126 at A23. Snyder was approved for approximately

three months of FMLA leave to recover from her surgery, and she concurrently received short-term disability pay during that time. D.I. 125 ¶ 56–57; D.I. 153 ¶ 56–57. The FMLA healthcare provider certification form produced by Dr. Kupcha's office stated that Snyder was to not bear weight for ten weeks after her surgery. D.I. 125 ¶ 52–53, D.I. 153 ¶ 52–53. Reports from Dr. Kupcha's office dated March 25, April 15, May 11, May 17, and June 2 that were provided to DuPont reaffirmed that Snyder should not place weight on her injured foot. D.I. 125 ¶ 58, 60, 69–70, 76; D.I. 153 ¶ 58, 60, 69–70, 76.

While Snyder was on leave, DuPont's Area Manager Stephen Coughlan was told by another employee, Paul Klimek, that Klimek saw Snyder walking around at a pool party. D.I. 127 at A121. Klimek also stated that he heard from "two-thirds of the [work]site, countless people" over a period of years that Snyder was taking advantage of DuPont's short-term disability program and was acting in a manner inconsistent with a need for disability leave. D.I. 127 at A190. Plant Manager Joe Guerrieri, Snyder's supervisor Randall King, and Coughlan made the decision to hire an investigative agency to surveil Snyder's activities. D.I. 125 ¶ 63; D.I. 153 ¶ 63. Surveillance of Snyder's actions during her recovery from foot surgery began April 13, 2016. D.I. 140 at C161. Coughlan testified that the surveillance was initiated to "ensur[e] that [Snyder] abided by the restrictions [of her doctor] on and off-duty." D.I. 127 at A123.

Video surveillance conducted by the investigator in April and May 2016 captured Snyder (1) repeatedly climbing into her Hummer SUV and driving, (2) walking around a backyard and down stairs, and (3) lifting a small child off the ground.  D.I. 125 ¶¶ 65–68, 73–75.

Reports from Dr. Kupcha's practice for Snyder's May 17 and June 2 office visits that were provided to DuPont stated that Snyder was to remain "non weightbearing" and "no driving."  D.I. 125 ¶ 70, 77; D.I. 153 ¶ 70, 77.  During her leave, Snyder told King that "all she does is lay around…in pain" and that she was unable to "come into work and sit down."  D.I. 125 ¶ 82, D.I. 153 ¶ 82.  In a phone call with King on June 16, Snyder stated that she could barely walk.  D.I. 127 at A136.  Dr. Kupcha noted after an August 5 visit that Snyder told him she felt a "sharp, stabbing, aching, dull, throbbing pain that occurs constantly," along with "swelling, bruising, tingling, weakness,…stiffness and numbness" and that her symptoms were aggravated by "standing, squatting, exercise, lying in bed, stairs, sitting, and walking."  D.I. 125 ¶ 93, D.I. 153 ¶ 93.

Eventually, Dr. Kupcha approved Snyder to return to work on a two-hour light duty schedule starting June 27, 2016.  D.I. 125 ¶ 88, D.I. 153 ¶ 88.  Snyder continued to receive short-term disability payments for the hours she did not work each day.  D.I. 125 ¶ 116; D.I. 153 ¶ 116.  On August 1, Dr. Kupcha released Snyder to work eight hours a day with restrictions; but after Snyder explained to

3

DuPont Medical Nurse McLaughlin that "the eight hours is killing me," Dr. Kupcha restricted Snyder to four-hour workdays beginning August 22. D.I. 125 ¶ 92, 98, 102; D.I. 153 ¶¶ 92, 98, 102.

On August 17, Snyder reported to DuPont Medical that her "left foot bec[a]me very pain[ful]." D.I. 125 ¶ 98; D.I. 153 ¶ 98. On August 18, she told Nurse McLaughlin that her foot was "swollen and very painful." D.I. 125 ¶ 99; D.I. 153 ¶ 99. On August 19, she told McLaughlin that her foot was "swelling." D.I. 125 ¶ 100; D.I. 153 ¶ 100. On August 19, 20, 22, and 23, the investigator reported that Snyder was walking without any apparent physical issues. D.I. 125 ¶ 100–102; D.I. 153 ¶ 100–102. On August 25, while still receiving partial disability payments from DuPont and working four-hour light duty shifts because the eight-hour shifts were "killing [her]," Snyder was recorded on surveillance walking through a Wal-Mart parking lot without crutches, a boot, or a limp, getting a manicure and pedicure, and mowing her lawn on a riding tractor for 90 minutes. D.I. 125 ¶ 98, 104–107; D.I. 153 ¶ 98, 104–107.

On September 14, DuPont fired Snyder. D.I. 126 at A56. HR Manager Cheryl Drew testified that Snyder was terminated because she "gave [DuPont] inaccurate information[,] . . . did not follow her own doctor's orders…, and [did] not behav[e] in a manner that's consistent with [her] recovery." D.I. 127 at A156–A157. Snyder testified that Drew informed her of her termination and told her that

4

she was "observed going to Wal-Mart and getting [her] nails done" on August 25 and that "we don't pay people to cut their grass." D.I. 125 at A51. In an email sent from Guerrieri to Drew memorializing the conversation that took place, Guerrieri stated,

> [Drew] told Peggy that during disability leave, we expect employees to accurately represent the facts regarding their ability to work, and that they follow their doctor's orders to support their recovery and eventually return to work. [Drew] told Peggy that she (1) misrepresented the facts to Randy and DuPont HIS and (2) she used DuPont disability leave for purposes that are inconsistent with her recovery and counter to her doctor's orders. [Drew] said for these two reasons, we are ending [her] employment effective today.

D.I. 127 at A208.

Snyder initiated this lawsuit on August 20, 2018 when she filed a six-count complaint. Five counts were dismissed by stipulation. D.I. 108, 133. The remaining claim, Count II, alleges that DuPont terminated Snyder in retaliation for her use of FMLA leave in violation of 29 U.S.C. § 2615(2).

## II.   LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the burden of persuasion at trial would be on

the non-moving party, then the moving party may satisfy its burden of production by pointing to an absence of evidence supporting the non-moving party's case, after which the burden of production then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). "In an employment discrimination case, the burden of persuasion on summary judgment remains unalterably with the employer as movant." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). "[A] dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* (internal quotation marks omitted). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a

scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). "[T]he facts asserted by the nonmoving party, if supported by affidavits or other evidentiary material, must be regarded as true . . . ." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). If "there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Id.*

## III.  DISCUSSION

FMLA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Budhun v. Reading Hosp. and Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014). To prevail on her retaliation claim, Snyder must show that: "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Id.* (citations omitted). If Snyder can establish a prima facie case, then "the burden shifts to the defendant to provide evidence of a legitimate non-discriminatory reason for the adverse action." *Id.* (citation omitted). If DuPont can meet this "minimal burden," then Snyder must "point to some

7

evidence that the defendant's reasons for the adverse action are pretextual." *Id.* (citation omitted). To show pretext, Snyder must present "some evidence…from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

Snyder alleges that she suffered two adverse employment actions: her termination and DuPont's surveillance of her. DuPont argues that summary judgment is warranted with respect to Snyder's termination because Snyder has not adduced record evidence to show a causal link between her termination and Snyder's invocation of her FMLA rights and therefore Snyder has failed to establish a prima facie case of retaliatory discrimination. DuPont argues that summary judgment is warranted with respect to both her termination and DuPont's surveillance of her because, even if Snyder made out a prima facie case of retaliation, she has failed to adduce record evidence that DuPont's proffered reasons for surveilling and terminating her were pretextual.

### A. Termination

#### 1. Causation Requirement of Prima Facie Case

The Third Circuit "has focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." *Abramson*

*v. William Paterson Coll. of N.J.,* 260 F.3d 265, 288 (3d Cir. 2001) (citations

omitted). Snyder does not rely on the temporal proximity between her use of

FMLA leave (which ended on June 27, 2016) and her termination (on September

14, 2016) to demonstrate causality but instead argues that DuPont's antagonism

and animus towards her establishes the requisite causal link. D.I. 135 at 22–27.

Nothing in the record, however, supports a finding of a pattern of antagonism

towards Snyder for taking FMLA leave. To the contrary, Snyder took

approximately 20 FMLA and short-term disability leaves of absence during her 19

years at DuPont without negative consequence. D.I. 125 ¶ 121; D.I. 153 ¶ 121.

DuPont never denied Snyder a request for FMLA leave, D.I. 125 ¶ 121; D.I. 153, ¶

121, and each time Snyder returned from FMLA, she was placed back in the same

or a similar position she had at the time she took leave and she always received the

same salary and benefits she had enjoyed prior to her leaves of absence. D.I. 126

at A18.

## 2. Legitimate Non-Discriminatory Reason for Termination

Even if Snyder did make out a prima facie case of FMLA retaliation,

DuPont has offered legitimate non-discriminatory reasons for her termination that

Snyder has failed to demonstrate are pretextual. DuPont's burden in showing a

non-discriminatory reason for terminating Snyder is "relatively light" and its

explanation for firing Snyder must simply "permit the conclusion that there was a

nondiscriminatory reason for the unfavorable employment decision." *Fuentes,* 32 F.3d at 763 (citation omitted). Here, DuPont claims its terminated Snyder because of "(1) her flagrant exploitation of DuPont's short-term disability policy, (2) her disregard for her treating physician's prescribed restrictions, and (3) her repeated instances of dishonesty with respect to the severity of her foot injury—all in violation of DuPont's Code of Conduct." D.I. 124 at 5. DuPont's short-term disability plan required that "[t]o be considered disabled you must be unable to work because of an illness or injury," and its discipline policy expressly provided for immediate termination of an employee. D.I. 137 at B143–44, B224; D.I. 125 ¶ 44; D.I. 153 ¶ 44. DuPont's proffered reasons for termination are supported by record evidence and are nondiscriminatory. Accordingly, the burden rests with Snyder to prove they are pretextual. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804 (1973).

### 3.   **Evidence of Pretext**

To discredit DuPont's proffered reason and demonstrate pretext, Snyder must present "some evidence . . . from which a factfinder could reasonably either (1) disbelieve [DuPont's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [DuPont's] actions." *Fuentes,* 32 F.3d at 764 (citations omitted). To satisfy the first prong, Snyder

10

> cannot simply show that [DuPont's] decision was wrong
> or mistaken . . . [but] must demonstrate such weaknesses,
> implausibilities, inconsistencies, incoherencies or
> contradictions in the employer's proffered legitimate
> reasons for its action that a reasonable factfinder could
> rationally find them unworthy of credence and hence
> infer that the employer did not act for [the asserted] non-
> discriminatory reasons.

*Id.* at 765 (internal quotation marks and citations omitted).  To satisfy the second

prong and show that discrimination was more likely than not a motivating or

determinative cause of DuPont's action, Snyder "must point to evidence with

sufficient probative force for a factfinder to make this conclusion; i.e. that

[DuPont] has previously discriminated against [her], that [DuPont] has

discriminated against other persons within [Snyder's] protected class or within

another protected class or that [DuPont] has treated more favorably similarly

situated persons not within the protected class." *Parker v. Verizon Pa. Inc.,* 309

Fed. App'x 551, 556–57 (3d Cir. 2009) (citing *Simpson v. Kay Jewelers,* 142 F.3d

639, 644–45 (3d Cir. 1998)).

 Snyder first attempts to discredit DuPont's reasons for terminating her by

arguing that DuPont failed to follow its own progressive discipline policy when it

terminated her without offering her coaching to correct her behavior or allowing

her to explain her actions.  D.I. 135 at 3, 18–19, 26, 29–33.  Snyder cites DuPont's

progressive discipline policies from both 2013 and 2015 to support her argument.

D.I. 135 at 16, 18–19 (citing D.I. 137 at B143, B224).  But although the policies in

question allow for progressive discipline of employees to correct performance issues, they also expressly permit the immediate termination of any employee. *See* D.I. 137 at B144 ("Depending on the level of infraction to performance, the level of discipline may begin at any level up to and including termination."); D.I. 137 at B224 ("Depending on the severity of the performance infraction, corrective action may begin at any level up to and including termination."). Thus, contrary to Snyder's representations, DuPont's treatment of Snyder was not inconsistent with its disciplinary policies.

Snyder next argues that DuPont's stated reasons for her termination should be discredited because DuPont "fail[ed] to verify with Snyder's treating physician about her physical capabilities and assum[ed], incorrectly, that she violated his instructions...." D.I. 135 at 26–27. But Snyder admits that DuPont's medical department "monitored her condition" and "communicated with Dr. Kupcha's office regularly with continual emails and messages." D.I. 135 at 7. It is also undisputed that DuPont received updates on Snyder's condition and Dr. Kupcha's instructions for her recovery through the Attending Physician's Statements filled out by Dr. Kupcha's office. D.I. 139 at 28–29. And it is undisputed that the reports DuPont received from Dr. Kupcha's office stated that Snyder was not to bear weight or drive. Thus, DuPont had sufficient knowledge about Snyder's physical capabilities and the instructions provided by Dr. Kupcha. And it was not

necessary for it to seek out more specific information about Snyder's condition, such as whether riding a lawn mower violated Snyder's doctor's orders.[1] The Attending Physician's Statements and the video surveillance provided to DuPont gave it good reason to believe that Snyder was misrepresenting her condition and violating her doctor's orders. *See Parker,* 309 Fed. App'x at 557 (rejecting plaintiff's argument that employer's reason for termination should be discredited since the employer did not have specific information regarding plaintiff's illness because "[d]etailed information was not required for [the employer] to determine that [plaintiff] misrepresented his health condition").

Snyder next accuses DuPont of using "[q]uestionable video tapes . . . to justify [her] termination, some of which actually confirmed her compliance with her physician's orders." D.I. 135 at 26. In Snyder's words: "The defendant's video surveillance, although subject to challenges as to date stamping authenticity, demonstrate[s] that Snyder was in compliance with her doctor['s] instructions." D.I. 135 at 10. Snyder points to the fact that some of the video surveillance

---

[1] Snyder claims that she was terminated because "DuPont considered the after hours use of a hand operated riding lawnmower to be such grave misconduct as to warrant termination...." D.I. 135 at 32. But there is no support in the record for her claim. DuPont had received months of video surveillance showing Snyder violating her doctor's orders, and DuPont has never asserted that Snyder was fired only because of the surveillance showing her riding a lawnmower.

recordings "show her using crutches and a boot, non-weight bearing [sic]," D.I. 135 at 11.

It is undisputed, however, that the videos show Snyder at times bearing weight, driving her Hummer, and lifting a child. D.I. 125 ¶¶ 65–68, 73–75; D.I. 153 ¶¶ 65–68, 73–75. And it is undisputed that during that time period Dr. Kupcha ordered Snyder not to drive and not to engage in weight-bearing activities. D.I. 125 ¶ 58, 60, 69–70, 76–77; D.I. 153 ¶ 58, 60, 69–70, 76–77. Thus, the fact that at other times Snyder was recorded adhering to her doctor's orders is of no consequence. Snyder's vague allegations about the "questionable[ness]" of the video recordings and "date stamping authenticity" issues are similarly unavailing. Snyder does not allege, let alone prove, that DuPont knew or had reason to question the authenticity or accuracy of the video recordings on which it relied.

Snyder next argues broadly that "Defendant's inconsistencies and contradictions of the Defendant'[s] story" are evidence of DuPont's discriminatory animus. D.I. 135 at 29. But the only inconsistency Snyder identifies is that "Minner testified that Snyder should have been given an opportunity to explain her side, before she was terminated" and "Drew testified that the decision was made before the termination meeting...." D.I. 135 at 32–33. It is unclear what Snyder alleges is inconsistent here. Snyder appears to be merely reframing her earlier

14

argument that she was improperly denied an opportunity to explain herself before her termination.

Snyder's remaining arguments shift from discrediting DuPont's justifications to suggesting "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [DuPont's] actions." *Fuentes,* 32 F.3d at 764.   Snyder claims, for example, that DuPont's surveillance of her shows discriminatory animus.   But "[n]othing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave." *Parker*, 309 Fed. App'x at 563 (citation omitted).   Snyder also points to the invasive tactics employed by the third-party investigator to conduct the surveillance.   But she does not allege or prove that DuPont was aware of those tactics.   D.I. 135 at 10.   Snyder also argues that Randall King's expression of "a need for more time for additional surveillance to make a 'case' against her" shows discriminatory animus.   D.I. 135 at 26.   But even assuming that this statement shows that King wanted to terminate Snyder, Snyder fails to explain how it shows a *discriminatory* motivation tied to Snyder's use or invocation of FMLA leave.

Snyder also cites the following deposition of testimony of Joseph Guerrieri as evidence of actionable animus:

> There were times that Peggy came back to work.   And had she just stayed at work and everything would have been fine.   We wouldn't be here today.   But then she would have immediately saved the minimum, the

15

> minimum amount of time to get the FMLA clock reset
> and then immediately go back out and then she would
> return to work again.

D.I. 137 at B321.  In assessing whether these remarks are probative of

discrimination, the following factors are considered: "(1) the relationship of the

speaker to the employee and within the corporate hierarchy; (2) the temporal

proximity of the statement to the adverse employment decision; and (3) the

purpose and content of the statement." *Parker,* 309 Fed. App'x at 558–59

(citations omitted).  In this case, Guerrieri made the remarks on May 7, 2020—

more than three years after DuPont fired Snyder.  Snyder does not argue that

Guerrieri made any similar statements before or at the time of Snyder's

termination.  In *Parker,* the Third Circuit found that remarks by a decisionmaker

seven months before the plaintiff's termination did not support the plaintiff's claim

that his termination was motivated by discriminatory intent.  *Id.* at 559.  In this

case, because the comments were made over three years after Snyder's

termination, as in *Parker,* I "decline to depart from the principle that such stray

remarks are rarely given great weight when made temporally remote from the

decision to terminate [Snyder]." *Id.*

Finally, Snyder cites as evidence of DuPont's discriminatory animus the fact

that "DuPont [] has a long history of attempting to convince [her] to retire on

disability because of various medical issues from which she suffered." D.I. 135 at

6.   To support this assertion, Snyder cites to three letters sent to her by DuPont's human resources manager "request[ing] that she resign" and "implying she should apply for 'Total & Permanent Disability Leave.'"  But the letters were sent to Snyder in 2005 and 2007—more than a decade before Snyder was terminated.  D.I. 137 at B058–061.  Accordingly, no reasonable juror would infer from those letters that DuPont's firing of Snyder in 2016 was based on discriminatory animus.

### B.   Surveillance

DuPont states in its reply brief that "Plaintiff's analysis establishes that surveillance has been deemed by courts to be a *per se* adverse employment action."  D.I. 139 at 4.  And it does not argue that Snyder failed to establish a prima facie case of retaliation based on DuPont's surveillance of her.  Instead, DuPont contends that summary judgment is warranted because DuPont proffered legitimate, nondiscriminatory reasons for conducting the surveillance and Snyder failed to establish that the proffered reasons were pretextual.

### 1.   Legitimate Non-Discriminatory Reason for Termination

The deposition testimony of multiple employees established that DuPont's decision to surveil Snyder was based on information that reasonably suggested that Snyder had misrepresented her need for disability leave.  Paul Klimek testified that over the span of years, he had been told that Snyder was acting in a manner inconsistent with a need for disability leave from "[t]wo-thirds of the site,

countless people." D.I. 140 at C003–C004. Joseph Guerrieri testified that he "had a couple of employees tell [him] that they've seen [Snyder] out, that they knew she was doing things that she could have easily been doing while at work." D.I. 140 at C036. Stephen Coughlan also testified that while Snyder was out on leave, he heard "[t]hat she was out at a party, a pool party, in the back of a yard walking around." D.I. 140 at C009. Lastly, Cheryl Drew stated that another employee, John Piscorek, had complained to her that "while [Snyder] was out on DuPont paid disability, [he saw her] engaging in activities that were not consistent with her recovery" such as going out on a boat at the beach. D.I. 140 at C015–C016. As Coughlan testified, based on this information, the purpose of the surveillance was "ensuring that [Snyder] abided by the restrictions on and off-duty." D.I. 140 at C010. And as noted above, "[n]othing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave." *Parker*, 309 Fed. App'x at 563 (citation omitted).

Because DuPont provided a legitimate nondiscriminatory reason for surveilling Snyder, to survive summary judgment, Snyder "must present evidence to show that [DuPont's] proffered reasons were not its true reasons, but were merely a pretext for its illegal action." *Naber v. Dover Healthcare Assocs., Inc.*, 765 F.Supp.2d 622, 634 (D. Del. 2011) (citation omitted).

## 2.    Evidence of Pretext

Snyder has failed to establish a genuine dispute about whether DuPont's surveillance was actually motivated by discrimination.  Snyder states that "[t]he antagonism and animus evidenced by the Defendant's inconsistencies and contradictions of the Defendant'[s] story clearly demonstrates a pretext, animosity for the use of FMLA so as to be pretextual."  D.I. 135 at 29.  But Snyder does not explain what "inconsistencies and contradictions" related to her surveillance would create a question of fact about whether DuPont's nondiscriminatory explanation for the surveillance was pretextual.

Snyder argues that the surveillance violated DuPont's policies and she implies that this fact shows discriminatory animus.  But the portions of the record she cites in support of the argument's premise—i.e., that the surveillance violated DuPont's own policies—do not suggest, let alone establish, that DuPont violated its policies.  For example, Snyder states in her brief that "DuPont has no documents memorializing reasons for the two[-]year surveillance of Snyder even though no surveillance could be started without such documentation."  D.I. 135 at 9.  But the deposition testimony she cites in support of this statements reads as follows:

> Q: Have you ever seen surveillance started on somebody
> without any documentation memorializing the reasons
> for it?

19

A: No, I don't know, I don't recall.

*See* D.I. 137 at B234. She similarly argues that the surveillance violated DuPont's progressive discipline policy. D.I. 135 at 30–31. But the policy she says DuPont violated states that "issues involving unacceptable employee performance and/or behavior will be managed through a progressive corrective action process…[and] [w]hen performance deviates from acceptable norms, corrective action steps will be used as an opportunity for the employee to change and improve performance and/or behavior." D.I. 137 at B224. Snyder does not explain how initiating surveillance to determine if she was "deviating from acceptable norms" violates a policy that by its express terms does not apply unless the employee deviates from acceptable norms. In addition, as noted above, DuPont's policy on discipline also provided that "[d]epending on the severity of the performance infraction, corrective action may begin at any level up to and including termination." D.I. 137 at B224.

Finally, Snyder argues that the evidence that DuPont relied on to justify the surveillance is inadmissible hearsay. D.I. 135 at 33–34. Snyder objects specifically to Klimek's testimony about widespread rumors of Snyder's out-of-work activities that were inconsistent with her claimed disability. But the testimony was not offered by DuPont for the truth of the matter asserted and therefore is not hearsay. Fed. R. Evid. 801(c)(2). DuPont offered Klimek's

20

testimony to show the effect of the rumors on DuPont's management and to justify the alleged adverse actions taken by DuPont against Snyder.

## IV.    CONCLUSION

For the reasons discussed above, I will grant DuPont's motion for summary judgment.

The Court will issue an Order consistent with this Memorandum Opinion.